LAKESIDE MANUFACTURING COMPANY *vs.* CITY OF WORCESTER.

Worcester.   October 5, 6, 1904. — October 18, 1904.

Present: KNOWLTON, C. J., BARKER, HAMMOND, & BRALEY, JJ.

*Damages.   Watercourse.   Practice, Civil,* Exceptions.   *Evidence,* Collateral issues: remoteness, Opinion: experts, Of value of real estate.

On a petition against the city of Worcester for damages caused by its taking of the waters of Kettle Brook under St. 1895, c. 384, the petitioner and the respondent agreed that all damages, except for the value of the use of the waters of the brook for purposes of power, should be submitted to a referee.   This was done and an award was made and accepted.   On a claim for the damages excepted, heard by commissioners and afterwards tried in the Superior Court, it was *held,* that the diminution in value in the parts of the property which had been procured or constructed in order to make the right to use the water available was included in the former award for property taken, and was not a part of the excepted claim for damages for value of the brook for purposes of power; *also,* that the right of the petitioner to use its dam, and its flowage rights in the lands of others conveyed to it by deeds, likewise were parts of the property taken and therefore were included in the former award; *also,* that evidence of the cost of reproducing the dam, and evidence of the special value of the water for washing and scouring, rightly were excluded as immaterial in assessing the value of the water for purposes of power, the only question open.

One lawfully using the waters of a stream in maintaining a mill cannot acquire a prescriptive right to have other riparian proprietors farther up the stream continue to maintain reservoirs which they have maintained in the exercise of their right as such proprietors and which incidentally have operated to his advantage in increasing the power at his mill.

In assessing the damages of a mill owner, for loss of water power by the taking of the waters of a stream as a water supply, it is right to refuse to instruct a jury, that, if the substitution of steam power for water power would be a reasonable

and proper mode of using the property after the taking of the water, the measure of the petitioner's damages due solely to the taking of the water power "is the cost of producing annually a full equivalent therefor by the substitution of steam power for the water power taken"; because, although this would be a proper subject for consideration by the jury, it cannot be said as matter of law that the measure of damage is the cost that might result from a certain reasonable mode of repairing the damage, to the exclusion of other reasonable and proper modes; also because such an instruction would assume that present conditions would remain unchanged; and also because the cost of procuring another kind of power at great expense would include an expenditure made necessary on account of damage which otherwise would come to the other property of the mill owner, and therefore would exceed the amount of damage due solely to the taking of the water power.

It is no ground for exception, that a presiding judge refuses to instruct the jury upon a part of the evidence and to say that there is a possible view of the evidence which would warrant them in coming to a certain conclusion.

On a petition by a mill owner for damages from the taking of a stream as a water supply, upon the issue of the value of the water power to the petitioner, evidence as to the value of the use of water in connection with a reservoir below the petitioner's mill receiving part of its water from a watershed which did not supply the petitioner's pond, properly is excluded as too remote.

On the issue of the value to a mill owner of the water power of a stream taken as a water supply, a question, as to the average daily yield in horse power from the watershed feeding the stream, including times of the highest water and of the lowest, may not be competent to show the usual available power of the stream, where it appears that at certain seasons of the year a large amount of surplus water ran to waste.

At the trial of a petition by a mill owner for damages from the taking of a stream as a water supply, on the issue of the value of the waters for purposes of power, the presiding judge in the exercise of his discretion properly may refuse to allow a mechanical engineer having a large experience with steam power, who has no knowledge of values in the neighborhood, except that of a mechanical engineer, to state, from his knowledge of the cost of producing horse power in that locality and in other localities, what was the value per horse power of the power of the stream at the petitioner's mill, the judge allowing the witness to give the cost of producing the power.

At the trial of a petition by a mill owner for damages from the taking of a stream as a water supply, on the issue of the value of the waters for purposes of power, the presiding judge in the exercise of his discretion properly may refuse to allow an expert in hydraulic engineering familiar with the cost and value of water power and steam power, but having no knowledge of the value of real estate in the town where the petitioner's mill is situated, or elsewhere, and knowing of no sales of power apart from land, to give his opinion as to the value of the waters of the stream in question and as to the damage to the petitioner's property caused by the taking of the waters.

At the trial of a petition by a mill owner for damages from the taking of a stream as a water supply, on the issue of the value of the waters for purposes of power, where a mechanical engineer of large experience in connection with steam engines and the production of power by steam, who made tests of the engines at the petitioner's mill before the stream was taken, has testified at length and in detail as to what it would cost to produce steam power at this mill, and then says that to produce it with a new steam plant and under the most favorable condi-

tions would cost somewhat less than the amount he has stated, as he made his estimates of the cost under existing conditions at the mill, and if he further says that he then cannot state how much less, the presiding judge may in his discretion order the testimony to be stricken out and give the witness an opportunity to present another estimate later. In making an estimate of the cost of production of power, as the basis of a general assessment of damages for all time, the best test would be the cost under the most favorable conditions, and not under conditions merely temporary.

At the trial of a petition by a mill owner for damages from the taking of a stream as a water supply, on the issue of the value of the waters for purposes of power, the presiding judge in his discretion properly may exclude the opinion of a witness founded wholly on the value of the plant of his own mill farther down the stream arrived at from an offer made for it.

At the trial of a petition by a mill owner for damages from the taking of a stream as a water supply, the petitioner cannot ask the trustee of a savings bank at what rate of interest, at the time of the taking, money could be invested safely for a long term of years, this being too remote and too uncertain to be of assistance in assessing the damages.

At the trial of a petition by the owner of a mill in a small town for damages from the taking of a stream as a water supply, on the issue of the value of the waters for purposes of power, the presiding judge properly may exclude the testimony of a witness as to the value of power in a certain city, in the absence of evidence that the value of power in the small town where the petitioner's mill is situated is the same as its value in the city.

PETITION, filed June 4, 1903, to the Superior Court for a trial by jury to determine the damages to which the petitioner was entitled incidental to the use and value of the waters of Kettle Brook for purposes of power, including any unoccupied fall, from the taking of the waters of that stream by the city of Worcester under St. 1895, c. 384, to increase its water supply.

In the Superior Court the case was tried before *Pierce*, J. The jury found for the petitioner and assessed damages in the sum of $21,984.54. The petitioner alleged exceptions to certain rulings of the judge and to the exclusion of certain evidence, raising the questions stated by the court.

*C. M. Rice*, for the petitioner.

*A. P. Rugg*, (*J. F. Humes* with him,) for the respondent.

KNOWLTON, C. J. This was a petition to recover damages for the taking of the waters of Kettle Brook, under the St. 1895, c. 384. The taking included all the waters of the brook at the petitioner's woollen factory, and above it, together with the factory itself, the dam, the pond and lands around it, and certain lands of other parties. The petitioner and the respondent agreed to divide the damages into two parts for the purpose

of assessment, and submitted to three referees the petitioner's claim for damages "sustained by the taking of land, water and water rights, and by the construction of any aqueducts, reservoirs or other works in relation to the waters of Kettle Brook, . . . except the damages incidental to the use and value of the waters of said Kettle Brook for purposes of power, including any unoccupied fall or power that may be damaged by said taking," etc. Under the submission these referees awarded a certain sum as damages, which was paid. The claim for the remaining damages was heard before commissioners under the statutes, and the petitioner afterward demanded a trial by jury in the Superior Court. The case is before us on exceptions taken by the petitioner at this trial.

The important question is how the exception in the submission which defines the petitioner's present claim is to be construed in its application to certain facts. This claim is for "damages incidental to the use and value of the waters of said Kettle Brook for purposes of power, including any unoccupied fall or power that may be damaged by said taking." The claim formerly considered was for all other damages caused by this taking. There is nothing in the record to show that damages were claimed by the petitioner for any injury to property which was not taken, and it would seem, therefore, that the intention was to divide the value of all that was taken into two parts, and to have the value of the use of the waters for the purposes of power assessed in one sum, and the value of everything else that was taken assessed in another sum. Of course the value of each part was to be assessed in reference to the fact that, at the time of the taking, it was connected and used with the other. If either part had been taken without taking the other, the claim for damages would have been not only for the fair value of the part taken, but also for the injury to that which was left, by reason of the taking of that which was essential to its profitable use. In that case, the damage for injury to that which was left would be incidental, in a sense, to the taking of the other part. If the use of the water and nothing else was taken, the dam and water wheel and the rights of flowage over lands of other persons would become of little value, and the mill and the machinery would be greatly

reduced in value, unless power from another source could be procured to operate them. So, if everything but the use of the water was taken, the right to this use would be worthless without ownership of the land, and the damage for the taking of the land would include the incidental damage to the right to use the water. We do not think the parties intended that this kind of damage should be assessed as incidental to the taking of either part of the property, but that the assessment for each part should be at its fair value as a part of the whole, thus dividing the entire damages represented by the value of all that was taken into two parts, proportional to the values of the respective classes of property for which the assessments were to be made. The diminution in value in the parts of the property which had been procured or constructed in order to make the right to use the water available was not a damage incidental to the taking of the right to use the water, because these parts of the property were also taken, and were to be paid for by the respondent. This conclusion furnishes a ground on which we may dispose of several of the important exceptions.

Another question grows out of the fact that, at various points on the stream above the petitioner's mill, reservoirs had been constructed and used by riparian proprietors, in a reasonable way, and in the exercise of their rights as such proprietors, to hold back the water and equalize and increase the power at their mills. Several of these had been in existence for many years, and the use of them, over which the petitioner exercised no control, materially increased the power at its mill. The petitioner contended that it had a legal right to have these reservoirs continued and used as they had been used; but the respondent contended and the judge ruled that the petitioner had acquired and could acquire no prescriptive rights to have the reservoirs maintained and used as the owners of them had been accustomed to use them, and that the value of its power must be determined in reference to this fact. This was plainly correct, and the exceptions founded upon an assumption to the contrary must be overruled. *Thurber* v. *Martin*, 2 Gray, 394. *Gould* v. *Boston Duck Co.* 13 Gray, 442. *Springfield* v. *Harris*, 4 Allen, 494. *Vliet* v. *Sherwood*, 35 Wis. 229. *Crawford Co.* v. *Hall*, 60 L. R. A. 889, 909. The judge, however, instructed the

jury as follows: "You have the right to take into consideration in determining the amount of natural water power which would be developed on this stream, the watershed, the situation of the privileges as they are along down, the fact that there were reservoirs at that time in 1895, and had been, and the various configurations and conditions relating to that shed and that power including therein of course the nature of the soil, its adaptability, its capacity for holding water, the question whether the swamps would retain water upon any part of the watershed, the question whether or not there are trees, the question whether or not there are springs upon the land, and everything else which existed as has appeared in the testimony in this case, which will enable you to come to the conclusion as to not only the amount of water which would naturally fall upon that shed from the clouds, but those things which are related to its conservation and preservation and its continued flow." He further instructed them as to these upper reservoirs that they could continue "as long as the owners saw fit to have them continue, . . . that the waters which were contained in them could not be sent down in unreasonable bodies at any time, and that the privileges which were below could not be flooded, neither could the waters be unduly retained."

The first request for instructions was that the petitioner's right to use and maintain its dam and its flowage rights was not included in the former submission, and that the damages for the taking of these rights were to be assessed in this suit. This is covered by the first proposition which we have stated as to the construction of the agreement of submission. These flowage rights were rights in the lands of others, conveyed by deeds. They and the dam and the right to maintain it were parts of the property which were to be considered and paid for under the first reference.

The second and third requests were, that if the substitution of steam power for water power was an economical and proper mode of repairing the damage at the privilege, due to the taking of the water, and if the use of the mill privilege for manufacturing purposes, with steam power substituted for the water power taken, would, after the taking, have been a reasonable and proper mode of using the property to obtain the best

financial results, then the measure of the petitioner's damages due solely to the taking of the water power, "is the cost of producing annually a full equivalent therefor by the substitution of steam power for the water power taken as aforesaid." While this would be a proper subject for the consideration of the jury, we should be slow to say as a matter of law that the measure of damages was the cost that might result from a certain reasonable and economical mode of repairing the damage, to the exclusion of every other reasonable and proper mode, the financial result of which might not be precisely the same. Besides, the proposed instruction assumed that the present conditions would remain unchanged in the future.

A separate and independent answer to the request is that, because of expensive buildings and machinery upon the property, adapted to the manufacture of a particular kind of goods, which would be of little value without power, it might be economical, if the power was taken and the remainder left, to procure another kind of power, even at a great expense, rather than to suffer a heavy loss on the mill and the machinery. In such a case the great cost of the new kind of power would represent, not the fair value of the power, taken as a part of the whole property, on the basis of its proportional part of the value of the whole, but it would represent the value of the power taken, together with an additional sum made necessary on account of the damage which would otherwise come to the property which was left. As no property was left in this case, such damage is not to be assessed in determining the damage for taking the power.

For the same reason, it would have been erroneous for the judge to give the ninth instruction requested. In the case supposed the assessment suggested in the request would have given the value of the property taken, with an additional sum for the damage to the remaining property.

The fourth, fifth, sixth and seventh requests for rulings are all founded upon the contention that the petitioner was entitled to have the reservoirs, on the stream above, managed and used in the future as they had been in the past, which, as we have already said, was erroneous.

The eighth request was that upon all the facts of the case,

it was competent for the jury " to ascertain what amount of money invested at a reasonable rate of interest would produce an annual income amounting to the annual cost of replacing the amount of water power taken away by substituting steam · or other power for the water power so taken." This is, in substance, a request to instruct upon a part of the evidence, and to say that there is a possible view of the evidence which would warrant a jury in coming to a certain result. An instruction of this kind, without more, would usually be confusing, and thus misleading. The court is not called upon to instruct in this way. *Hicks* v. *New York, New Haven, & Hartford Railroad*, 164 Mass. 424, 428, and cases cited. The jury were told that they might consider the subject of substitution of other power for the water power, and the cost of such substitution, if they found this method reasonable.

The remaining exceptions are to the exclusion of evidence. The award of Ball and Buttrick and the use of the water in accordance with it had reference to a reservoir below the petitioner's mill, which received a part of its water from a watershed which ·did not supply the petitioner's pond. It was rightly excluded, as being too remote to be of assistance to the jury.

The petitioner inquired of one Allen if he had computed the amount of power that could be developed by the petitioner's plant, taking into account the natural flow of the watershed, as regulated by the several reservoirs, etc., and asked what would be the average daily yield in horse power from that shed, including the reservoirs. The form of the questions as to what " could be developed," and what would be the " average daily yield," indicates that the question was put under the petitioner's contention that it had a right to control the future use of the reservoirs, in accordance with the manner of their former use, in the development of its power, which, as we have said, was erroneous. The average daily yield, including times of the highest water and of the lowest, would not fairly represent the usual available power. A witness testified that " at certain seasons of the year a very large volume of water would come down over the watershed, a very much larger volume of water than at other seasons of the year, and when the pond was filled so it would run over the flash boards they would put on full gate

and run full gate, which took a great deal more than the natural flow of the stream and they ran the mill some nights all night, and by the operation of the mill over time and by using open gate they were able to manage the surplus of water in the wet seasons." There was other testimony as to the usual amount of water power used at the mill. We are of opinion that the petitioner cannot justly complain of the exclusion of this question.

The witness Hill was a mechanical engineer of large experience, especially in connection with steam engines and the production of power by steam. He testified that he had made tests of the engines at the petitioner's mill before the water was taken. It did not appear that he had any knowledge of values in that neighborhood, except that of a mechanical engineer. He was asked to state, from his knowledge of the cost of producing horse power in that locality and in other localities, what was the value of power there per horse power. The question was excluded, but he was permitted to give the cost of producing it. The witness Tolman had been a partner of the last witness, and was a mechanical engineer who testified to a large experience with steam power. It did not appear that he had any knowledge of the value of power in the vicinity of the petitioner's mill, except that derived from his knowledge of the cost of producing it. He was asked the market value of power per horse power at the petitioner's mill previous to the taking, and the question was excluded. He was permitted to testify as to the cost of producing power at that place by steam or any other method. The witnesses Allen and Shedd were experts in hydraulic engineering, and in that capacity were familiar with the cost and value of water power and steam power; but it did not appear that either of them had any knowledge of the value of real estate in the town of Leicester, where the petitioner's mill was situated, or elsewhere, or that they knew of any sales of power apart from land. These witnesses were asked to give an opinion as to the value of the waters of Kettle Brook, and as to the damage to the petitioner's property caused by the taking of the water. For the reasons stated in *Conness* v. *Commonwealth*, 184 Mass. 541, it was within the discretion of the presiding judge to exclude these questions to the several witnesses; and so far as appears, the discretion was properly exercised. The

witness Hill having testified at length and in detail as to what it would cost to produce steam power at this mill, said that to produce it with a new steam plant and under the most favorable conditions would cost somewhat less than the amount he had stated, as he had made his estimates of the cost under existing conditions at the mill. Having said that he could not then state how much less, his testimony was stricken out on motion of the respondent, and he was given an opportunity to present another estimate later. It was within the discretion of the presiding judge to make this order. In making an estimate of the cost of production of power, as a foundation for an assessment of damages in gross, the best test would be the cost under the most favorable conditions. While the cost with the inferior engine then in use might be pertinent in reference to the damage for a time, before a better engine could be substituted economically, it would be misleading if made a basis for a general assessment for all time. What we have said on this point applies also to the testimony of the witness Tolman.

The witness Olney was called to testify generally as to the damages in question; but he said his opinion was founded wholly on the value of his own plant, which was a mill farther down the stream, and that he arrived at the value of that from an offer which had been made for it. The judge might well find that he was not an expert in the value of real estate, or qualified to give the opinion asked for.

What it would cost to reproduce the dam was immaterial to the inquiry before the court. The dam, the land under the pond and the flowage rights in the lands of others, were a part of the property for which damages were to be assessed in the former reference. The use of the water for power, with any unoccupied fall that might be damaged, was the only property to be paid for by this assessment. For this reason the petitioner's evidence of a special value in the water for washing and scouring was also rightly excluded.

The question to the trustee of a savings bank as to the rate of interest at which money could be invested safely for a long term of years was too remote to be of assistance. The percentage of income that can be obtained from investments changes from time to time, as everybody knows, and the inquiry as to an

investment for a given term of years, would introduce an element of too much uncertainty, in various particulars, to be helpful upon the question of damages.*

No error is shown in the exclusion of the testimony of the witness Ely as to the value of power in the city of Worcester. It does not appear that the value of power in the small town where the petitioner's mill was situated was the same as its value in the city of Worcester.

*Exceptions overruled.*

---

* The petitioner argued, that this evidence was admissible to show the jury what rate of interest they ought to use in computing the principal sum which would yield an annual income equal to the annual cost of replacing the water power by steam.